# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-CV-22650-RAR

**ANGELA HEATH**, *individually and on behalf of the Estate of Randy Heath*,

      Plaintiff,

v.

**MIAMI-DADE COUNTY**,

      Defendant.

_____/

## <u>ORDER DENYING DEFENDANT'S PARTIAL MOTION TO DISMISS</u>

The Eighth Amendment's prohibition against cruel and unusual punishment imposes upon the government an affirmative obligation to provide medical care for incarcerated individuals. This case concerns alleged failures by Miami-Dade County's Corrections and Rehabilitation Department to provide adequate medical care for Randy Heath, an inmate with serious mental health issues.  Before the Court is Defendant Miami-Dade County's Partial Motion to Dismiss Plaintiff Angela Heath's (as Personal Representative of Randy Heath's Estate) Second Amended Complaint ("MTD") filed on October 27, 2023, [ECF No. 30].[1]  Having carefully considered Plaintiff's Second Amended Complaint ("SAC"), [ECF No. 23]; the MTD; the record; and being otherwise fully advised, it is hereby

      **ORDERED AND ADJUDGED** that the MTD, [ECF No. 30], is **DENIED** as set forth herein.

---

[1] The Motion to Dismiss is fully briefed and ripe for adjudication.  *See* Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss SAC ("Response"), [ECF No. 31]; Def.'s Reply to Resp. in Opp'n to Mot. to Dismiss SAC ("Reply"), [ECF No. 34].  The Court notes that Defendant moves to dismiss only Count 1 and Count 2 of the SAC but not Count 3. *See generally* Motion.

## BACKGROUND

Plaintiff Angela Heath brings this action against Defendant Miami-Dade County as Personal Representative of her deceased son Randy Heath's Estate.  *See* SAC ¶ 1.  Plaintiff's Amended Complaint—which is accepted as true for purposes of this Order except where otherwise noted—alleges the following relevant facts.  Turner Guilford Knight Correctional Center ("TGK") is located in Miami, Florida and operated by Defendant Miami-Dade County.  *See* SAC ¶ 9. Specifically, TGK is operated by the Miami-Dade Corrections and Rehabilitation Department ("MDCR") and houses adult men and women—both misdemeanor and felony inmates—whom local county or municipal law enforcement have arrested.  SAC ¶ 9.  The MDCR is a Miami-Dade County Department that serves all Miami-Dade County's 30 municipal police departments, the County police department ("MDPD"), as well as state agencies.  SAC ¶ 9.

Randy Heath died on July 18, 2021 while incarcerated at TGK at the age of 39.  *See* SAC ¶¶ 15; 36.  Mr. Heath had been diagnosed as both bipolar and schizophrenic at the time he was booked at TGK in November 2020, and TGK staff were allegedly aware of Mr. Heath's mental health conditions upon his arrival.  *See* SAC ¶ 13.  As of May 2020, several months prior to being booked, Mr. Heath was prescribed an antidepressant, an antipsychotic, and bipolar medication for his mental health conditions, and he was taking these medications regularly.  *See* SAC ¶ 13. Notwithstanding his mental health conditions, Mr. Heath weighed nearly 200 pounds at the time of his booking.  SAC ¶ 13.  He was also able to communicate, bathe himself, and shave.  SAC ¶ 13.

But Mr. Heath's condition deteriorated while he was incarcerated.  SAC ¶ 14.  According to Plaintiff, he was not provided with adequate medical attention at TGK despite his obvious need for help.  SAC ¶ 14.  According to numerous unidentified witnesses, TGK staff left Mr. Heath on

the floor unattended for hours at a time in his own urine and feces; failed to administer the necessary medications to treat Mr. Heath's mental health conditions despite the TGK staff's knowledge that he required said medicine; did not properly feed him; did not adequately monitor his well-being; and generally neglected and mistreated him, which Plaintiff alleges led to his premature death. *See* SAC ¶ 14–15.

As to the cause of Mr. Heath's death, the medical examiner determined that he died from "food asphyxia" after a piece of orange was found blocking his airway. SAC ¶ 16. According to Mr. Heath's family, however, Mr. Heath did not eat oranges. SAC ¶ 16. Further, at the time of his death, Mr. Heath's autopsy report revealed that he weighed close to one hundred pounds. *See* SAC ¶ 15. The SAC also includes pictures showing bruising on Mr. Heath's dead body. *See* SAC at 8–10. TGK staff provided no explanation as to the cause of that bruising. *See* SAC ¶ 16. Mr. Heath's post-mortem toxicology report revealed no medications detected in Mr. Heath's body at the time of his death, including no trace of the antidepressant, antipsychotic, and bipolar medications that he had been prescribed to treat his mental health conditions prior to being booked at TGK. *See* SAC ¶ 15. Nor was there any indication in Mr. Heath's medical records that he was taken to a hospital or otherwise provided with medical attention leading up to his death, despite the obviousness of his deteriorating physical condition. SAC ¶ 16.

Critically, Plaintiff also alleges that TGK's mistreatment, neglect, and indifference to inmates' medical needs was not isolated to Mr. Heath. *See* SAC ¶ 21–34. Instead, Plaintiff claims that Mr. Heath's experience was symptomatic of a decades-long pattern of deliberate indifference on the part of both TGK staff and MDCR—and thus by Defendant—towards the serious medical needs of inmates housed in MDCR facilities. *See* SAC ¶ 21–34. Specifically, the SAC points to a series of incidents between 2004 and 2011 involving the failure of MDCR staff to provide

medical treatment to inmates—including three inmate suicides that occurred at MDCR facilities from 2010 to 2011 alone. SAC ¶ 21a. Plaintiff also cites multiple Miami New Times articles from 2004 through 2007 criticizing MDCR's staffing decisions and MDCR's ineffective administration of medical care to inmates. SAC ¶ 21b.

Separately, Plaintiff cites a Department of Justice ("DOJ") investigation initiated in 2008 into alleged constitutional and civil rights violations of inmates housed at MDCR facilities. SAC ¶ 21b. In 2011, as part of this investigation, the DOJ Civil Rights Division issued findings in a letter addressed to Carlos Alvarez, the former mayor of Miami-Dade County, in which the DOJ concluded that there existed "a pattern and practice of constitutional violations in the correctional facilities operated by MDCR, and as a result of the unconstitutional violations in the correctional facilities operated by MDCR, and as a result of the unconstitutional operation of the Jail, prisoners suffer grievous harm, including death." SAC ¶ 21c. Two years later, in 2013, DOJ filed a legal complaint against Miami-Dade County in this District, in which DOJ accused MDCR jails of violating inmate rights under the Constitution. *See* SAC ¶ 21c.

Notably, Defendant entered into an agreement after the DOJ filed its complaint in which Defendant pledged to screen inmates for mental health risks and categorize them properly; provide inmates with easier access to mental healthcare; train jail staff to better identify and interact with inmates who are at risk of harming themselves; and curb the use of force by MDCR staff to ensure inmate safety ("Consent Agreement"). SAC ¶ 26. At a December 2022 hearing, United States District Judge Beth Bloom, who was overseeing the DOJ case, stated "the parties contemplated that Miami-Dade County would be in full compliance in six months, and here we are nine years later." SAC ¶¶ 27. At the same hearing, Judge Bloom also stated "I do not think anyone in this courtroom believes that these inmate deaths are normal occurrences. I do not know if there's

anyone in this courtroom that is willing to say that it's not as a result of certain deficiencies that have been observed." SAC ¶ 28. According to the SAC, Miami-Dade County Mayor Daniella Levine Cava spoke directly to Judge Bloom in December 2022 about her priority to bring the jails into compliance with the Consent Agreement: "We are assuring that . . . we can establish the new leadership, improve our culture, and maintain a qualified workforce with improved morale, very essential to moving forward [sic][.]" SAC ¶ 33.

Defendant Miami-Dade County faced a deadline at the end of October 2023 to comply with the 2013 Consent Agreement, a deadline by which MDCR was required to demonstrate to Judge Bloom that its correctional facilities were meeting minimum health and safety standards for inmates. *See* SAC ¶ 25. As part of the Consent Agreement, Susan McCampbell was assigned as an independent monitor to ensure County compliance with the agreement and to issue status reports to the Court regarding Defendant's progress. *See* SAC ¶ 32. McCampbell resigned as independent monitor in 2023, citing systemic issues within the county jails that still were not being addressed, ten years into the agreement. *See* SAC ¶ 32. "The deficiencies identified by the Independent Monitors are long-standing," McCampbell wrote in her August 2022 status report, "[a]t the core of the County's inability to gain and sustain compliance are the internal culture of the organization, leadership ambivalence, and absence of sufficient subject matter expertise." SAC ¶ 32.

The SAC also includes statements from recent former inmates in MDCR facilities, including a former TGK inmate named Ingrid Caputo. SAC ¶¶ 30, 34. Ingrid Caputo was incarcerated at TGK within the last six years and suffered from bipolar disorder and schizophrenia during her incarceration there. *See* SAC ¶ 30. According to Ms. Caputo, during the period of her incarceration at TGK, she and other inmates with mental illnesses were not treated with basic

human decency.  SAC ¶ 30.  Caputo was allegedly forced to take medication without being told what it was, even though she was already taking prescribed medicine for her mental illnesses.  SAC ¶ 30.  When she took the medicine MDCR staff provided her, she claims she had an adverse reaction and that MDCR staff assumed she was trying to harm herself rather than addressing her medical needs.  *See* SAC ¶ 30.

Finally, according to the SAC, Defendant Miami-Dade County, Mayor Levine Cava, and James Reyes, then-Director of MDCR (collectively, "Policymakers") knew about patterns of inadequate medical care and inadequate training and supervision at TGK, and Defendant, via its Policymakers, failed to remedy these failures.  SAC ¶ 4.  These failures, Plaintiff alleges, deprived Mr. Heath of his rights under the Constitution and caused him unwarranted and excruciating physical and mental anguish, eventually leading to his death.  SAC ¶ 4.  Plaintiff further claims that TGK staff consciously disregarded the rights of Mr. Heath, knowing that the Policymakers would ratify or approve of their actions.  SAC ¶ 4.  Finally, Plaintiff claims the Policymakers were aware that inmates—including Mr. Heath—were being mistreated and neglected at TGK and did nothing to prevent or correct it.  *See* SAC ¶ 15.

The SAC advances three counts against Defendant Miami-Dade County: Count 1 alleges Defendant's deliberate indifference to serious medical needs in violation of the Eighth Amendment pursuant to 42 U.S.C. § 1983; Count 2 alleges Defendant's failure to adequately train or supervise TGK employees in violation of the Eighth Amendment pursuant to 42 U.S.C. § 1983; and Count 3 alleges wrongful death.  Defendant moves to dismiss only Counts 1 and 2, arguing that Plaintiff's allegations are conclusory and do not satisfy the elements required to hold a municipality liable under § 1983 as established in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) and its progeny.  Mot. at 3–4.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2) requires a "short and plain statement of the claim," but a complaint must set forth more than "labels and conclusions" or a mere "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Instead, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In addition to accepting the complaint's allegations as true, the court must draw all inferences in the plaintiff's favor when determining if a complaint states a claim to relief. *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017). But courts "are not bound to accept as true a legal conclusion couched as a factual allegation," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555), and need not accept as true allegations that are "more conclusory than factual." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012).

A claim to relief is plausible where the plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The requirement that a claim be plausible does not require that it be probable, "but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Allegations that are "merely consistent with" the defendant's liability are not enough. *See Twombly*, 550 U.S. at 557. Ultimately, "determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Holland v. Carnival Corp.*, 50 F.4th 1088, 1093 (11th Cir. 2022) (alterations accepted) (quoting *Iqbal*, 556 U.S. at 679).

<u>ANALYSIS</u>

Defendant Miami-Dade County argues that Counts 1 and 2 should be dismissed because the SAC has insufficiently pleaded the elements of a *Monell* claim under § 1983. Mot. at 3–4. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. In *Monell*, the Supreme Court held that a municipality or other local government may be liable under § 1983 if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell*, 436 U.S. at 692.

The Supreme Court has placed strict limitations on municipal liability under § 1983. *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). Specifically, "under § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 479 (1986)). In other words, "a county is 'liable under section 1983 only for acts for which the county is actually responsible.'" *Grech*, 335 F.3d at 1329 (quoting *Marsh v. Butler County*, 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc)). Consequently, a municipality's liability under § 1983 may not be based on the doctrine of respondeat superior. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (collecting cases). "It is only when the 'execution of the government's policy or custom . . . inflects the injury' that the municipality may be held liable." *Id.* at 1290 (quoting *City of Canton v. Harris,* 489 U.S. 378, 385 (1989)). A municipality does not incur § 1983 liability for injuries caused solely by its employees. *Id.* (citing *Monell,* 436 U.S. at 694). "Nor does the fact that a plaintiff has suffered a

deprivation of federal rights at the hands of a municipal employee infer municipal culpability and causation." *Id.* (citing *Bd. of County Com'rs v. Brown,* 520 U.S. 397, 403 (1997)). "Instead, to impose § 1983 liability on a municipality, a plaintiff must show that: (1) his or her constitutional rights were violated; (2) the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that policy or custom caused the constitutional violation." *Id.* (citing *Canton*, 489 U.S. at 388).

As to the deliberate indifference prong, a "municipality may be held liable under § 1983 only when the deprivation at issue constituting deliberate indifference to a constitutional right was undertaken pursuant to city 'custom' or 'policy.'" *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir. 1991) (collecting cases). Thus, "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Id.* at 1479–1480 (collecting cases). "A 'municipal act' is not, however, limited to decisions made by the city's official legislative body or in written agreements." *Id.* at 1480. "[Municipal] policy also may be implicated by the acts of individual policymaking officials or by pervasive city custom." *Id.* (citing *Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir. 1989)). "This threshold identification of a custom or policy 'ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.'" *McDowell*, 392 F.3d at 1290 (quoting *Brown*, 520 U.S. at 403–04). "This prevents the imposition of liability based upon an isolated incident." *Id.* (citing *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("Normally, random acts or isolated incidents are insufficient to establish a custom or policy")). "Rather, the incident must result from a demonstrated practice." *Id.* at 1290 (citing *Wayne v. Jarvis*, 197 F.3d 1098, 1106 (11th Cir. 1999)).

As a preliminary matter, despite Plaintiff's alternative theories of relief under *Monell*, the County fails to effectively identify and distinguish the applicable legal standards and arguments for dismissing Count 1 from those for dismissing Count 2. Further, throughout the MTD, Plaintiff indiscriminately mixes the legal standards applicable to various other *Monell* theories not relevant here.[2] In order to untangle this confusing morass, the Court first clarifies that Counts 1 and 2 of the SAC proceed upon theories of unofficial custom and official policy, respectively—and that Plaintiff has properly identified Miami-Dade County Mayor Daniella Levine Cava as a final policymaker for purposes of *Monell* liability. The Court then proceeds to consider the MTD's specific pleading-sufficiency arguments for Counts 1 and 2 before concluding that both Counts survive dismissal.

## I.   Counts 1 & 2 – "Custom or Policy" Analysis and Final Policymaker Identification

A plaintiff seeking to hold a municipality liable under § 1983 must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Wayne*, 197 F.3d at 1105 (quoting *Brown*, 520 U.S. at 403). The Eleventh Circuit has defined custom as "a practice that is so settled and permanent that it takes on the force of the law." *Id.* (quoting *Sewell v. Town of Lake Hamilton*,

---

[2] For example, Defendant cites *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1115 (11th Cir. 2005) and *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)—both of which Defendant adduces in support of dismissing Plaintiff's deliberate-indifference-to-medical-needs claim. *See* MTD at 14–16 ("A plaintiff must also establish that the County's final policymakers had *subjective knowledge* of a risk of serious harm *and consciously disregarded that risk.*") (emphasis in original). But *Gold* was a failure-to-train case and does not state the applicable standard for a deliberate-indifference-to-medical-needs claim. And even more problematic, *Gold* does not contain the words "subjective knowledge" anywhere in the opinion. While the standard articulated in *Gold* is applicable to Count 2, it is not applicable to Count 1. Similarly, *Cook* was a prisoner suicide case, which also triggers a different applicable legal standard. However, the MTD explicitly argues that this is not a prisoner suicide case, arguing instead that Mr. Heath died as a result of choking on a piece of food. MTD at 11–12. The legal principles applicable to prisoner suicide cases articulated in *Cook* are accordingly inapposite here. The MTD fails to appreciate these dispositive distinctions. Finally, Defendant also cites the legal standards for a series of deliberate-indifference-to-medical-needs claims brought against individual prison officials and medical providers. These cases are also inapplicable given that the SAC names only the County as Defendant and does not name any officials or medical providers in an individual capacity.

117 F.3d 488, 489 (11th Cir. 1997)).  "In order for a plaintiff to demonstrate a policy or custom, it is 'generally necessary to show a persistent and wide-spread practice."  *McDowell*, 392 F.3d at 1290 (quoting *Wayne*, 197 F.3d at 1105); *see also Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994).

A plaintiff "has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county."  *Grech*, 335 F.3d at 1329–30 (citing *Monell*, 436 U.S. at 690–91; *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999)). "Because a county rarely will have an officially-adopted policy of permitting a particular constitutional violation, most plaintiffs . . . must show that the county has a custom or practice of permitting it and that the county's custom or practice is 'the moving force behind the constitutional violation.'"  *Grech*, 335 F.3d at 1330 (alterations accepted) (quoting *City of Canton*, 489 U.S. at 389).

### A.  *Count 1 Proceeds Upon a Theory of Unofficial Custom*

To prove § 1983 liability against a municipality based on unofficial custom, a plaintiff must establish a widespread practice that, "although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Brown*, 923 F.2d at 1481 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  "In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it."  *Id*.  "A custom or practice, while not adopted as an official formal policy, may be so pervasive as to be the functional equivalent of a formal policy."  *Grech*, 335 F.3d at 1330 n.6 (citing *Monell*, 436 U.S. at 690–91; *Church*, 30 F.3d at 1343).  And "[a] single incident would not be so pervasive as to be a custom

or practice." *Id.* (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality) (stating that when establishing liability for a custom or practice, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*")).

Here, Count 1 alleges an unofficial custom by Miami-Dade County of deliberate indifference to inmates' serious medical needs during the time Mr. Heath died in TGK. *See* SAC ¶¶ 38–64. More specifically, Count 1 avers that the County had a years-long, *de facto*, and unwritten policy of deliberate indifference to the serious medical needs of inmates, like Mr. Heath, who were suffering from serious mental illness while incarcerated in MDCR facilities. *See* SAC ¶¶ 41–47.

### B. Count 2 Proceeds Upon a Theory of Official Policy

A local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. *Connick*, 563 U.S. at 61. In other words, a plaintiff can demonstrate official policy for the purposes of a municipality's § 1983 liability by showing a government policy of inadequate training or supervision. *Mingo v. City of Mobile, Ala.*, 592 F. App'x 793, 799 (11th Cir. 2014) (citing *Am. Fed'n of Labor and Congress of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1188 (11th Cir. 2011); *Tuttle*, 471 U.S. at 822–23).

With respect to Count 2, the SAC alleges that Defendant did not provide adequate training for TGK staff to ensure proper monitoring and treatment for inmates suffering from serious mental health issues. SAC ¶¶ 67–77. Thus, Count 2 alleges that Miami-Dade County had an official policy of failing to train or supervise MDCR and TGK staff to effectively jail inmates suffering from serious mental illness at the time of Mr. Heath's death. *See Mingo*, 592 F. App'x at 799.

### C. *Plaintiff has Properly Identified a Final Policymaker*

Under either the official policy or unofficial custom approaches outlined above, a plaintiff must also (1) show that the local governmental entity, here Miami-Dade County, has authority and responsibility over the governmental function at issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation at issue. *Grech*, 335 F.3d at 1330 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996)).

As explained above, Counts 1 and 2 proceed upon a theory of unofficial custom and official policy, respectively. Defendant does not appear to contest that Miami-Dade County is the local governmental entity with responsibility and authority over MDCR and TGK. *See* MTD at 15. And the SAC has also properly identified a policymaker with final policymaking authority over the government function at issue: Mayor Levine Cava. SAC ¶ 4. While the SAC also names then-MDCR Director James Reyes, SAC ¶ 4, who Defendant argues was not a policymaker with final policymaking authority for the purposes of *Monell* liability, Defendant nonetheless apparently concedes (1) that Defendant Miami-Dade County has authority and responsibility over the governmental function at issue—*i.e.*, funding, operating, and staffing MDCR facilities—and (2) that Mayor Levine Cava has final policymaking authority over that governmental function—here, jailing. *See* MTD at 15. Accordingly, the SAC has sufficiently identified Mayor Levine Cava as the proper county official with final policymaking authority over MDCR and TGK for purposes of pleading a *Monell* claim against a municipality. The Court now turns to the pleading sufficiency of the specific counts Defendant moves to dismiss.

## II.  Count 1 – Deliberate Indifference Claim

The Supreme Court has determined that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  And to state a *Monell* deliberate-indifference-to-serious-medical-needs claim against a municipality, a plaintiff must allege: (1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) a causal connection between that indifference and the plaintiff's injury.  *See Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009)); *see also Roy v. Ivy*, 53 F.4th 1338, 1346–47 (11th Cir. 2022).  "Delays in medical treatment 'that are tantamount to unnecessary and wanton infliction of pain may constitute deliberate indifference.'"  *Roy*, 53 F.4th at 1347 (alterations accepted) (quoting *Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995)).

As explained below, Plaintiff has adequately pleaded (1) that Mr. Heath had a serious medical need; (2) that Defendant Miami-Dade County, through its officials with final policymaking authority, had an unofficial custom of deliberate indifference to inmates' serious mental health needs; and (3) that this deliberate indifference caused Mr. Heath's injury.

### A.  *Plaintiff Adequately Pleads a Serious Medical Need*

The SAC adequately alleges that Mr. Heath had a serious medical need related to his extant bipolar disorder and schizophrenia diagnoses, conditions for which he had been diagnosed and was undergoing treatment at the time he was booked at TGK.  *See* SAC ¶ 13.  The SAC alleges that at the time he was booked, Mr. Heath weighed approximately 200 pounds and was able to communicate with TGK guards, bathe himself, and shave.  *See id.*  The SAC also alleges that TGK

staff knew about Mr. Heath's mental health conditions when he was booked. *Id.* Plaintiff has thus sufficiently pleaded Mr. Heath's serious medical need in the form of serious mental illness.

### B. Plaintiff Adequately Pleads Defendant's Deliberate Indifference to Inmates' Serious Medical Needs

Because the sole Defendant is Miami-Dade County—a municipality—in order to plead a deliberate-indifference-to-medical-needs claim, Plaintiff must allege the County had a "policy or custom" of deliberate indifference to inmates' serious medical needs. *See Craig,* 643 F.3d at 1310; *see also Monell*, 436 U.S. at 694 ("Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). The Court has already determined that Count 1 proceeds upon a theory of unofficial custom. And in the absence of an official policy endorsing a constitutional violation, as here, Plaintiff must adequately allege that the municipality had a custom or practice of permitting such a violation. *Roy*, 53 F.4th at 1347 (citing *Craig*, 643 F.3d at 1310). A custom must be such "a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Id.* In other words, to constitute a custom, "[a] pattern of similar constitutional violations . . . is 'ordinarily necessary.'" *Craig*, 643 F.3d at 1310 (citing *Connick*, 563 U.S. at 62). "This requirement of proof 'prevents the imposition of liability based upon an isolated incident' and 'ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality[.]'" *Id.* (quoting *McDowell*, 392 F.3d at 1290). "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.* at 1310–11 (citing *Brown*,

520 U.S. at 404).  "A single incident of a constitutional violation is insufficient to prove a policy

or custom even when the incident involves several employees of the municipality." *Id.* at 1311;

*see, e.g.*, *McDowell*, 392 F.3d at 1289–91 (affirming summary judgment where plaintiff had not

been able to identify other instances where jail's understaffing and resulting inability to transport

inmates to hospital had exacerbated an inmate's medical condition and concluding instead that

Plaintiff's experience was an "isolated incident.").[3]

Applying these principles to the SAC, Plaintiff has adequately alleged that Defendant's

deliberate indifference to inmates' serious mental health needs was an unofficial custom at

MDCR's facilities, including TGK, and that this practice was "sufficiently longstanding and

widespread . . . that it [can be] deemed authorized by the policymaking officials because they must

have known about it but failed to stop it." *Roy*, 53 F.4th at 1347.  The County's main argument

for dismissal of Count 1 rests on Defendant's contention that Mr. Heath's tragic death was an

---

[3]  The County attempts to import into its analysis of Count 1 a requirement that the final policymaker must
have had *actual* knowledge of an alleged unofficial custom of deliberate indifference to inmates' serious
medical needs to survive dismissal.  *See* MTD at 14–17.  But this appears to be an incorrect statement of
Eleventh Circuit law governing this species of *Monell* claim.  Indeed, Defendant has not cited, and the
Court has not identified, a single on-point, binding precedent standing for the proposition that final
policymakers must have had actual knowledge of an alleged unconstitutional pattern or practice in order to
adequately plead and/or prevail on a deliberate-indifference-to-medical-needs claim against a municipality
under § 1983.  To the contrary, the applicable precedent in this Circuit seems to consistently state that the
requisite scienter a plaintiff must demonstrate in this context amounts to *either* constructive *or* actual
knowledge.  *See, e.g.*, *Brown*, 923 F.2d at 1481 ("In other words, a longstanding and widespread practice
is deemed authorized by the policymaking officials because they must have known about it but failed to
stop it."); *Craig*, 643 F.3d at 1310 (same); *Roy*, 53 F.4th at 1347 (same).  Thus, Plaintiff need only allege
that Defendant had constructive *or* actual knowledge of a pattern or practice—*i.e,* an unofficial custom—
constituting a constitutional violation in order to adequately plead a deliberate-indifference-to-serious-
medical-needs claim.  Further, the Court notes that even if actual knowledge were required to establish final
policymaker approval of an unconstitutional pattern or practice of deliberate indifference to serious medical
needs, the SAC would nonetheless meet this requirement.  The fact remains that MDCR's deficiencies in
handling inmates with serious mental health needs was an ongoing issue in MDCR facilities at the time of
Mr. Heath's death, and Plaintiff has adequately alleged that Defendant's final policymakers had actual
knowledge of this issue.  The DOJ Complaint, newspaper articles, Consent Agreement, and the hearing
held in December 2022 all suffice to constitute adequately pleaded actual and constructive final
policymaker knowledge.

isolated occurrence, and that Plaintiff has thus insufficiently demonstrated a pattern or practice as required to establish an unofficial custom for the purposes of *Monell* liability.  *See* MTD at 7–14. Specifically, Defendant argues that Plaintiff has failed to identify a sufficient number of similar and contemporaneous incidents as required to establish a pattern or practice constituting unofficial policy under § 1983.  MTD at 11–12.  The Court disagrees.

Plaintiff pleads that TGK's mistreatment, neglect, and indifference to inmates' medical needs was not isolated to Mr. Heath in several different ways.  *See* SAC ¶ 21–34.  First, the SAC adduces a series of incidents between 2004 and 2011 involving MDCR staff's failure to provide medical treatment to inmates with serious medical needs, including three inmate suicides that occurred at MDCR facilities from 2010 to 2011 alone.  SAC ¶ 21a.  Plaintiff also cites multiple Miami New Times articles from 2004 through 2007 criticizing MDCR's staffing decisions and MDCR's ineffective administration of medical care to inmates.  SAC ¶ 21b.  Third, Plaintiff points to the DOJ Civil Rights Division's investigation initiated in 2008 into alleged constitutional and civil rights violations of inmates housed at MDCR facilities.  SAC ¶ 21c.  The SAC also recounts how, as part of this investigation, the DOJ issued findings in a letter addressed to Carlos Alvarez, the former mayor of Miami-Dade County, in which the DOJ concluded "a pattern and practice of constitutional violations in the correctional facilities operated by MDCR, and as a result of the unconstitutional violations in the correctional facilities operated by MDCR, and as a result of the unconstitutional operation of the Jail, prisoners suffer grievous harm, including death."  SAC ¶ 21c.

The SAC then states that in 2013, DOJ filed a legal complaint against Miami-Dade County in which DOJ accused MDCR jails of violating inmates' rights under the Constitution.  *See* SAC ¶ 21c.  After DOJ filed that complaint, Defendant entered into a Consent Agreement in which it

pledged to screen inmates for mental health risks and categorize them properly; provide inmates with easier access to mental healthcare; train jail staff to better identify and interact with inmates who are at risk of harming themselves; and curb the use of force by MDCR staff to ensure inmate safety. SAC ¶ 26. And, as Defendant concedes, MTD at 15–16, Mayor Levine Cava was present at a December 2022 hearing before Judge Bloom—a hearing that occurred 17 months after Mr. Heath's death in July 2021—which focused on Defendant's continued non-compliance with that same Consent Agreement, *nine years after* DOJ filed its complaint in 2013. SAC ¶¶ 27, 33. The SAC also alleges that, at the same hearing, Judge Bloom noted, "I do not think anyone in this courtroom believes that these inmate deaths are normal occurrences. I do not know if there's anyone in this courtroom that is willing to say that it's not as a result of certain deficiencies that have been observed." *See* SAC ¶ 28. Defendant also apparently concedes that additional deaths and suicides have occurred in MDCR facilities in the decade since the County entered into the Consent Agreement. MTD at 12 (citing SAC ¶ 28).

The SAC further pleads the independent monitor assigned to ensure the County's compliance with the Agreement resigned in 2023, identifying as her reason the systemic and cultural issues within the County's jail system, which she concluded had prevented the County's compliance with the Consent Agreement. *See* SAC ¶ 32. Finally, the SAC includes a statement from Ingrid Caputo, a former inmate at TGK within the last six years who suffered from bipolar disorder and schizophrenia during her incarceration. *See* SAC ¶ 30. According to Ms. Caputo, during the period of incarceration, she was allegedly forced to take medication without being told what it was, even though she was already taking prescribed medicine for her mental illnesses. SAC ¶ 30. When she took the medicine MDCR staff provided her, she claims she had an adverse

reaction and that MDCR staff assumed she was trying to harm herself rather than addressing her underlying mental health needs.  *See id.*  The SAC thus sufficiently alleges an unofficial custom.

In support of dismissal, Defendant emphasizes the lack of contemporaneousness, the lack of factual similarity, and the numerical insufficiency of the incidents alleged by Plaintiff.  *First*, as to contemporaneousness, Defendant cites *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1132 (11th Cir. 2021) and *Church v. City of Huntsville*, 30 F.3d 1332, 1346 (11th Cir. 1994) for the proposition that the incidents used to establish a pattern or practice here are too temporally attenuated from Mr. Heath's death.  But both cases are inapposite.  For one, neither dealt with a deliberate-indifference-to-medical-needs claim.  And in neither case did plaintiffs allege ongoing incidents continuing into the period of the alleged constitutional violations at issue.  Finally, both *Khoury* and *Church,* as with the overwhelming majority of cases Defendant cites in support of dismissal, were both decided at summary judgment, without the benefit of discovery.

Here, Plaintiff has alleged at least 13 incidents since 2004 in addition to an unspecified number of deaths and suicides that occurred after the County entered into the Consent Agreement in 2013, which the County concedes, MTD at 12.  Plaintiff alleges that these problems were ongoing as of July 2021, as evidenced by Judge Bloom's monitoring of the County's compliance with the Consent Agreement—an agreement the County had still not complied with at the time of Mr. Heath's death.  And Plaintiff alleges only those incidents of which she is aware, without the benefit of discovery, which will confirm the extent to which this alleged pattern or practice remained ongoing at the time of Mr. Heath's death.  Accordingly, Plaintiff has adequately alleged sufficient facts to survive dismissal.  *See La Bruno v. Miami-Dade Cnty.*, No. 10-22554-CIV, 2011 WL 1103783, at *6 (S.D. Fla. Mar. 23, 2011) ("La Bruno, on the other hand, alleges ten incidents without the benefit of discovery.  He also alleges that newspaper articles about (1) the inadequate

medical care inmates were receiving in the Miami–Dade Department of Corrections, (2) judges' orders for treatment being ignored, and (3) concerns regarding the professional competency of certain medical employees in the Department of Corrections, coupled with the Department of Justice's Investigation into possible constitutional violations, indicate that other incidents exist that contribute to the widespread and longstanding pattern.").

*Second*, Defendant argues that there is insufficient factual overlap between the incidents Plaintiff cites and the circumstances of Mr. Heath's death.  Defendant again cites *Khoury* and also cites *Robinson v. City of Bessemer*, No. 2:21-CV-00439-JHE, 2022 WL 1018391, at *6 (N.D. Ala. Apr. 5, 2022) in support of this point.  *Khoury* is again inapposite.  Apart from being decided at summary judgment as already discussed, the *Monell* claim in *Khoury* concerned allegations that a school board had a pervasive custom or practice of improperly relying upon the Baker Act to commit individuals for involuntary mental health examinations.  The *Khoury* Court affirmed the district court's grant of summary judgment, concluding that plaintiff had presented evidence of the school board's *prior* improper use of the Baker Act on students—but had failed to offer any evidence that the school board had a *current* policy indicating a pattern or practice involving the improper use of the Baker Act.  *See Khoury*, 4 F.4th at 1131.  The situation here is strikingly different, as the SAC recounts a pervasive ongoing pattern of repeated indifference to inmates' serious medical needs by way of multiple incidents.  The mere fact said incidents are not identical is of no moment given the common characteristics of each episode as recounted in the SAC.  *See La Bruno*, 2011 WL 1103783, at *5–6 (rejecting County's argument that incidents alleged by plaintiff lacked requisite similarity to constitutional violation alleged and concluding the issue could be framed as a failure to provide adequate treatment to inmates with serious medical needs as opposed to the narrower failure to provide medical treatment to inmates with HIV).

Defendant's reliance on *Robinson* fares slightly better given that it was decided at the dismissal stage rather than at summary judgment.  But in *Robinson,* the Court merely determined that evidence of a municipality being sued is insufficient to establish a pattern of civil rights violations. *See Robinson*, 2022 WL 1018391, at *6.  The *Robinson* Court also determined that plaintiff's reliance on two prior incidents of excessive force was deemed misplaced, as the facts and underlying municipal policy in those prior incidents were not sufficiently similar to the factual scenario and policy at issue in *Robinson*.  *Id.* (citing *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) ("A pattern requires similarity and specificity; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question.")).  Here on the other hand, Plaintiff has alleged repeated incidents of a specific type, all of which relate to MDCR facilities' alleged failures to provide appropriate medical care to treat inmates with serious mental health needs during the time of Mr. Heath's death.  *See* SAC ¶ 19–23.  Moreover, Judge Bloom's continued supervision of the County's efforts to comply with the Consent Agreement at the time of Mr. Heath's death independently supports the reaosnable inference that the alleged pattern or practice was ongoing when Mr. Heath died.  The mere fact Defendant was aware of and apparently working to remedy its deficiencies in providing MDCR inmates with appropriate medical treatment does not immunize the County from § 1983 liability.

*Third*, Defendant argues that, even if the Court were to find the incidents alleged in the SAC sufficiently similar and contemporaneous, Plaintiff has not alleged enough incidents to establish a pattern or practice as is required to hold a municipality liable under § 1983.  MTD at 13–14.  Defendant concedes that no case has elucidated a precise formula for the type and number of constitutional violations that must be alleged over a given time period in order to satisfy *Monell*. Nonetheless, Plaintiff concludes that "13 examples of misconduct over a period of almost twenty

years in a large jail system—the most charitable reading of the Second Amended Complaint—is clearly deficient." MTD at 13. Defendant then cites a series of out-of-circuit cases purportedly in support of this proposition. But each of these non-binding cases is inapposite and unavailing for the following reasons.

For one, each of the cases Defendant cites involved some kind of generalized corrections officer misconduct, prisoner abuse, or excessive force by law enforcement. None specifically involved a deliberate-indifference-to-serious-medical-needs claim. This is a dispositive difference because the numerical threshold for establishing a pattern or practice in the deliberate-indifference-to-serious-medical-needs context is necessarily lower than that in the generalized-officer-misconduct, prisoner-abuse, or excessive-force contexts. And in each of the cases Defendant cites, the complaints at issue pleaded prior incidents in overly general terms. Here, however, Plaintiff has sufficiently pleaded a series of specific incidents confined to Defendant's failures to provide care for inmates' serious medical needs in the recent past. Plaintiff has also sufficiently alleged that these deficiencies continued up until Mr. Heath died.

With that said, the Court finds it proper to emphasize that in order for Count 1 to survive summary judgment, discovery will need to reveal additional contemporaneous and factually similar incidents. But at the pleading stage, Plaintiff has included enough allegations in the SAC for the Court to draw the reasonable inference that there are additional relevant incidents peculiarly within the knowledge of the Defendant such that the Court cannot fairly require Plaintiff to set forth its allegations with additional specificity. Thus, the SAC sufficiently pleads that Defendant had the unofficial custom of permitting deliberate indifference to inmates' serious mental health needs.

### C. Plaintiff Adequately Pleads Causation

Finally, in order to hold a municipality liable under § 1983, a plaintiff must also establish that the municipality's policy or custom caused the plaintiff's injury. *See Roy*, 53 F.4th at 1347 (quoting *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020)). Specifically, a plaintiff must show that a municipality's unofficial custom or practice was the "moving force" behind the violation. *See id.* (citing *Craig*, 643 F.3d at 1310); *see also La Bruno*, 2011 WL 1103783, at *8 ("In a municipal liability analysis, a plaintiff shows that a custom or policy caused his constitutional violation by showing that the objectionable municipal policy was the 'moving force' behind the plaintiff's injury." (citing *Brown v. Bryan County*, 219 F.3d 450, 457 (5th Cir. 2000))).

With respect to Mr. Heath, the SAC alleges that his condition deteriorated while he was incarcerated because TGK staff (1) did not provide him with adequate medical attention despite his obvious need for help; (2) left Mr. Heath on the floor unattended for hours at a time in his own urine and feces; (3) failed to administer the necessary medications to treat Mr. Heath's mental health conditions despite their knowledge that he required it; (4) did not properly feed him; (5) did not adequately monitor his well-being; and (6) generally neglected and mistreated Mr. Heath, leading to his premature death. *See* SAC ¶¶ 14–15. The SAC further alleges that when he died at 39 years old, Mr. Heath's autopsy report revealed that he weighed only one hundred pounds; post-mortem pictures showed bruising on Mr. Heath's emaciated body; and a post-mortem toxicology report revealed no medications detected in Mr. Heath's body at the time of his death, including the notable absence of antidepressant, antipsychotic, and bipolar medications that Mr. Heath had been prescribed to treat his mental health conditions prior to being booked at TGK. *See* SAC ¶¶ 14–16; 36. Plaintiff also alleges that TGK staff provided no explanation as to the cause of Mr. Heath's bruising. *See* SAC ¶ 16. Nor was there any indication in Mr. Heath's medical record that he was

taken to a hospital to provide him with medical attention leading up to his death, despite the obviousness of his deteriorating physical condition, an allegation that the pictures in the SAC further substantiate.  *See* SAC ¶¶ 15–16; SAC at 8–10.

Based upon these allegations, the Court finds that Plaintiff has adequately alleged Defendant's unofficial custom of deliberate indifference to inmates' serious medical needs was the moving force behind Mr. Heath's death.  Specifically, Plaintiff alleges that Mr. Heath received inadequate treatment for his serious mental health needs—bipolar disorder and schizophrenia— and adduces circumstantial-yet-specific allegations including: (1) absence of prescribed medicine for treating these disorders in his bloodstream at the time of his death; (2) his loss of 100 pounds while incarcerated; (3) the unexplained bruising on his body at the time of his death; (4) his ability to communicate and take care of himself effectively while taking his medication prior to being incarcerated; and (5) his premature death at 39 years old.  SAC ¶¶ 13–17; 36.  And, as already explained, Miami-Dade County final policymakers were aware or should have been aware that inmates were receiving inadequate treatment because of prior incidents, information in the public domain, the DOJ suit, the Consent Agreement and related judicial proceedings in this District, and the resignation of the independent monitor in 2023.  "Causation follows naturally from [these sets of] allegations."  *La Bruno*, 2011 WL 1103783, at *8.  In sum, Plaintiff has sufficiently pleaded a *Monell* deliberate-indifference-to-medical-needs claim against the County.

### III.   Count 2 – Failure-to-Train Claim

The Court now turns to Plaintiff's failure-to-train theory of *Monell* liability.  Here, the County maintains that Plaintiff has not pointed to any other instances in which MDCR employees violated constitutional rights in a manner similar to that alleged in the SAC—such that the County was on notice of the need to train and supervise its employees to ensure inmates with serious

mental health needs were properly monitored and cared for.  *See* MTD at 17–19.  In other words, Defendant claims that the SAC advances only conclusory allegations concerning the County's alleged failure to train MDCR employees to handle and properly treat inmates with serious mental health needs.  *See id*.

A local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.  *Connick*, 563 U.S. at 61.  A plaintiff can demonstrate official policy for purposes of establishing § 1983 liability by showing a government policy of inadequate training or supervision. *Mingo*, 592 F. App'x at 799 (citing *Am. Fed'n of Labor,* 637 F.3d at 1188; *Tuttle*, 471 U.S. at 822– 23).  But "[s]ince a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees, the Supreme Court has further explained that a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants[.]"  *Gold,* 151 F.3d at 1350 (citing *Canton,* 489 U.S. at 389–91).  In other words, to satisfy § 1983 where there is no express oral or written policy of inadequate training or supervision, a municipality's failure to train its employees must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *See id.* (quoting *Canton,* 489 U.S. at 388–89).  But "[i]t is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983."  *Id.* (quoting *Canton,* 489 U.S. at 385).

Accordingly, for Count 2 to survive dismissal, Plaintiff must allege that (1) Defendant had a policy of failing to train TGK employees constituting deliberate indifference and that (2) this deliberate indifference led to a violation of Mr. Heath's Eighth Amendment rights.  *See id.* (citing

*Canton,* 489 U.S. at 389–91).  As explained below, Plaintiff has adequately pleaded a § 1983 failure-to-train claim against the County.

### A. *Plaintiff Adequately Pleads a Failure-to-Train Policy Constituting Defendant's Deliberate Indifference*

To establish that a municipality was "deliberately indifferent" in the failure-to-train context, a plaintiff must demonstrate that the municipality knew of the need to train in a particular area and made a deliberate choice not to take any action.  *Mingo*, 592 F. App'x at 799 (citing *Gold*, 151 F.3d at 1350).  "Deliberate indifference can be established in two ways: by showing a widespread pattern of similar constitutional violations by untrained employees or by showing that the need for training was so obvious that a municipality's failure to train its employees would result in a constitutional violation."  *Id.* at 799–800 (citing *Connick*, 563 U.S. at 61–62; *Gold*, 151 F.3d at 1350–52); *see also Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009). However, without actual or constructive notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise.  *Gold*, 151 F.3d at 1351; *see also Connick*, 563 U.S. at 61 ("Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." (citing *Brown*, 520 U.S. at 407)).

Turning to the SAC, Plaintiff has adequately alleged a widespread pattern of similar constitutional violations by untrained employees; that Defendant had both actual and constructive knowledge of MDCR staff's training deficiencies related to handling inmates with serious mental health needs; and that Defendant made a deliberate choice not to take sufficient remedial action to properly train MDCR and TGK staff to handle inmates with serious mental health needs.  Thus,

Plaintiff has adequately alleged that Defendant's failure to train its employees in handling inmates' serious mental health needs constituted deliberate indifference.

The Court has already explained at length why Plaintiff has sufficiently alleged a pattern or practice of constitutional violations related to MDCR's and TGK's handling of inmates with serious mental health needs—one of the two methods required to establish deliberate indifference in the failure-to-train context. And the Court has already concluded that Plaintiff has adequately alleged knowledge of this pattern or practice by Defendant's final policymakers and Defendant's failure to timely remedy said pattern or practice by the time of Mr. Heath's death in July 2021. The Court's analysis on this point applies with equal force in the failure-to-train context as it did in the deliberate-indifference-to-medical-needs context. While the allegations involving the ongoing DOJ litigation and Consent Agreement indicate that final policymakers may have taken some corrective action to remedy training deficiencies among MDCR and TGK staff, it is uncontested that at the time of Mr. Heath's death, Defendant had yet to fully comply with the terms of the Consent Agreement. Further, as already noted, the SAC also includes statements from Ingrid Caputo, a recent inmate at TGK with similar serious mental health conditions, who corroborated Plaintiff's allegations concerning TGK staff's ineffective and inexpert treatment of her identical condition during her time as an inmate in TGK. *See* SAC ¶ 30. Finally, as already discussed at length, the SAC also includes allegations concerning newspaper reports documenting MDCR staff's inadequate training, numerous other similar incidents, the DOJ lawsuit and Consent Agreement, and the independent monitor's August 2022 report, which stated "[a]t the core of the County's inability to gain and sustain compliance are the internal culture of the organization, leadership ambivalence, *and absence of sufficient subject matter expertise*." SAC ¶¶ 21; 32 (emphasis added).

The case of *Young v. City of Augusta*, cited in Plaintiff's Response, further supports the adequacy of Plaintiff's allegations.  59 F.3d 1160 (11th Cir. 1995).  In *Young*, the plaintiff was affected with manic-depressive disorder at the time of her imprisonment.  In relevant part, the plaintiff alleged that the "[c]ity failed to adequately select or train jail personnel to deal with inmates suffering from mental illness, or to provide on-site medical treatment" and because of these deficiencies, "treatment for her psychiatric condition was delayed until it reached emergency proportions." *Young*, 59 F.3d at 1165.  The district court granted summary judgment on plaintiff's § 1983 claim, finding that plaintiff's damages were not caused by a custom, practice, or policy of the city. *Id.*  On appeal, the Eleventh Circuit reversed, reasoning:

> [T]he need for more or better training may be obvious where a pattern of constitutional violations exists such that the municipality knows or should know that corrective measures are needed.  This court has therefore held that, to prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, "although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law."  In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it . . . The record in this case reveals that Young is not the only City inmate who has complained of a lack of adequate treatment for serious medical problems stemming from mental illness[.]

*Young*, 59 F.3d at 1172 (citations omitted).  The Eleventh Circuit's reasoning in *Young* applies here.  Plaintiff is clearly not the only current or former MDCR inmate to complain of a lack of adequate treatment for serious medical problems stemming from mental illness.  Further, the SAC sufficiently alleges this pattern is ongoing and that final policymakers were either aware or should have been aware of it at the time of Mr. Heath's death.  The Court accordingly concludes that Plaintiff has adequately alleged that the County's final policymakers had knowledge of a custom or practice of inadequate training constituting deliberate indifference.

### B. *Plaintiff Adequately Pleads Causation*

Having adequately alleged Defendant's deliberate indifference concerning the inadequate training of MDCR and TGK employees in handling inmates with serious mental health needs, Plaintiff must also allege that Defendant's policy of deliberate indifference caused the violation of Mr. Heath's constitutional rights. *See Gold*, 151 F.3d at 1350 (citing *Canton,* 489 U.S. at 389–91). Here, Plaintiff alleges that TGK staff were aware of Mr. Heath's serious mental health conditions and that his deteriorating physical condition was obvious. SAC ¶¶ 3; 13; 80. The SAC also alleges that, according to numerous unidentified witnesses, TGK staff left Mr. Heath on the floor unattended for hours at a time in his own urine and feces; did not properly feed Mr. Heath; did not adequately monitor his well-being; did not administer the medications he was prescribed for his serious mental health conditions despite knowing he needed them; did not attempt to provide him with medical attention or take him to a hospital leading up to his death; did not believe their actions would be monitored or supervised; and generally neglected and mistreated Mr. Heath, thereby causing his premature death. *See* SAC ¶¶ 14–17; 68. The pictures attached to the SAC further support these allegations. SAC at 8–10. Indeed, Mr. Heath's death and the factual circumstances surrounding it are *prima facie* evidence that the training deficiencies Plaintiff alleges were still ongoing at the time of Mr. Heath's death in July 2021. And, as with Count 1, the Court expects discovery to reveal the degree to which these training deficiencies persisted in the years and months leading up to Mr. Heath's death.

In sum, the SAC sufficiently alleges that, at the time of Mr. Heath's death, Defendant Miami-Dade County had a policy of inadequately training MDCR staff in handling inmates with serious mental health needs constituting deliberate indifference and that this policy caused a

violation of Mr. Heath's constitutional rights under the Eighth Amendment.  Count 2 accordingly survives dismissal.

## **<u>CONCLUSION</u>**

Based on the foregoing, the allegations in the SAC suffice to state plausible claims for relief against Defendant under Section 1983.  Indeed, Plaintiff has "plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  Consequently, Defendant's Partial Motion to Dismiss, [ECF No. 30], is **DENIED.**

**DONE AND ORDERED** in Miami, Florida, this 23rd day of May, 2024.

_____

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**